Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, GADEER ERAKAT

**UNITED STATES DISTRICT COURT**

**EASTERN DISTRICT OF CALIFORNIA**

GADEER ERAKAT, on behalf of herself and all similarly situated persons,

Plaintiff,

v.

HILTON DOMESTIC OPERATING COMPANY INC., a Delaware corporation,

Defendant.

Case No.: 2:26-cv-01387-DC-CSK

**FIRST AMENDED CLASS ACTION COMPLAINT**

1) Cal. Penal Code § 631
2) 18 U.S.C. § 2511(1)(a)
3) Cal. Bus. & Prof. Code § 17200, *et seq.*
4) Cal. Constitution Art. I § 1
5) Intrusion Upon Seclusion
6) Unjust Enrichment

Plaintiff GADEER ERAKAT ("Plaintiff") files this First Amended Class Action Complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant HILTON DOMESTIC OPERATING COMPANY INC., a Delaware corporation ("Defendant" or "Hilton"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I. NATURE OF THE ACTION

1. This is a class action lawsuit brought on behalf of all California residents who have accessed and used hilton.com and stories.hilton.com (the "Website"), a website that Defendant provides for public access and use.

2. Plaintiff personally used the Website during the class period, including on March 2, 2026, and preserved an HTTP archive file (commonly known as a HAR file) of one of her own browsing sessions. Plaintiff's HAR file records the outbound tracker requests, request parameters, server response times, per-request Set-Cookie identifier values, and response payload artifacts alleged in this Complaint, all transmitted by Plaintiff's browser to the Third Parties during that session. The figures and screenshots reproduced below are from an independent technical investigation counsel commissioned that replicated URLs and user flows presented in Plaintiff's HAR file, and are included as corroboration of the tracking transmissions documented in Plaintiff's own HAR file. All per-tracker timings, identifier values, and payload artifacts pled below are drawn from Plaintiff's HAR file.

3. During her use of the Website, and as reflected in her HAR file, Plaintiff typed the search query 'LGBTQ' into the Website's search function, which caused the Website's search API to receive the search parameter and return a search-results page at https://stories.hilton.com/search/LGBTQ, and Plaintiff then navigated to the following additional URLs, unaware that Defendant was causing and permitting Third Parties to intercept the content of her communications:

/ / /

• https://stories.hilton.com/destination-spotlight/hilton-celebrates-this-june-with-lgbtq-pride-offerings; and

• https://stories.hilton.com/destination-spotlight/stay-with-pride-stay-with-hilton-unforgettable-celebrations-await-lgbtq-travelers.

4. Defendant caused the interception of the contents of Plaintiff's communications with the Website, including the search query she entered into the Website's search function, the page URLs identifying what she was browsing, the page titles and content categories associated with those URLs, and the referrer URLs reflecting her prior navigation, which were transmitted to the Third Parties during the page-load process itself.

5. As set forth in the Specific Allegations section of this Complaint below, Defendant surreptitiously embeds and operates third-party tracking technologies on the Website that intercept the contents of users' electronic communications, including the page URLs reflecting what users are browsing, in real time and without notice or consent. Defendant intentionally deploys these technologies to accomplish its commercial objectives, including identity resolution, cross-session behavioral profiling, audience segmentation, and the monetization of users' browsing activity through targeted advertising and real-time bidding.

6. Plaintiff's electronic communications with the Website disclosed information that was embarrassing, invasive, or otherwise private. The search query she typed into the Website's search function was "LGBTQ," and the pages she subsequently viewed were articles addressing LGBTQ+ Pride content. The search query and the article URLs disclosed the sexual-orientation-related content Plaintiff was reading on the Website, a category of content the reading of which carries known outing and misattribution risks regardless of the reader's own sexual orientation. The Trackers' interception of Plaintiff's communications was not the mere capture of non-sensitive site-interaction data but the surreptitious acquisition of substantive, sensitive-content communications between Plaintiff and the Website.

7. The surreptitious, non-consensual interception of the contents of Plaintiff's and Class Members' electronic communications with the Website invaded their legally protected interest in controlling information concerning themselves. Violations of that right to privacy have long been actionable at common law, and such an invasion is a concrete and particularized injury sufficient to confer Article III standing. *In re Facebook, Inc. Internet Tracking Litig*., 956 F.3d 589, 598-99 (9th Cir. 2020); see Restatement (Second) of Torts § 652B cmt. b ("The intrusion itself makes the defendant subject to liability, even though there is no publication or other use of any kind of the photograph or information outlined."). Plaintiff and each Class Member suffered that injury when the Trackers intercepted the contents of their communications with the Website.

8. Defendant deploys these interception technologies in violation of the California Invasion of Privacy Act, Cal. Penal Code § 631, and the Federal Wiretap Act, 18 U.S.C. § 2511(1)(a). Defendant has done so from prior to the beginning of the class period in this case and continuously through to today and ongoingly.

## II. <u>GENERAL ALLEGATIONS</u>

9. A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

10. When triggered, the pixel causes the user's browser to transmit data to third-party servers, including the contents of the user's communications with the Website such as page URLs identifying what the user is browsing, referrer URLs reflecting prior navigation, page titles, session-level identifiers, and browser and device characteristics.

11. When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Treasure Data Tracker
- Koddi Tracker

- Facebook Pixel Tracker
- Microsoft Bing UET Pixel Tracker

12. The third parties who operate the above-listed Trackers use the intercepted contents of users' communications collected via the Website for their own independent commercial purposes tied to broader advertising ecosystems, cross-site profiling, and data monetization, which go beyond Defendant's direct commercial needs. The above-listed Trackers are referred to herein collectively as the "Trackers."

13. Under Meta Platforms, Inc.'s Business Tools Terms, Meta reserves the right to use the Event Data it receives from customer websites through the Meta Pixel, after aggregating that data with data collected from other advertisers and on Meta Company Products, to personalize the content and advertising it shows people on and off Meta Company Products, to determine the relevance of ads to people, and for research and development and to improve the Meta Company Products.

14. Treasure Data, Inc. operates a customer data platform that ingests Website-collected data and unifies it with Defendant's other first-party data sources to perform identity resolution and to build audience segments used for targeted advertising.

15. Koddi Inc. operates a commerce-media advertising platform, built on first-party data, that processes page-view and behavioral signals from users on its travel-industry customers' properties and enables the delivery of targeted advertising to those users across on-site and off-site channels, including through third-party demand-side platforms.

16. Microsoft's Universal Event Tracking pixel, once installed on the Website, logs users' page visits and events on the Website and transmits that data to Microsoft. Microsoft treats the data it collects through its tracking pixels as its own and uses that data for its own commercial purposes, including to build and improve its advertising services, to model and target audiences, and to deliver targeted advertising, including retargeting. Microsoft serves such advertising to those users on its own properties, including Bing, MSN, and Microsoft Outlook.

17. The Trackers are operated by distinct third parties, including Treasure Data, Inc. (as to Treasure Data), Koddi Inc. (as to Koddi), Meta Platforms, Inc. (as to the Facebook Pixel), and Microsoft Corporation (as to the Bing UET Pixel) (collectively, the "Third Parties"). Defendant knowingly embeds and deploys the Trackers on the Website and configures them to execute automatically within users' browsers upon page load and navigation. As a result, Defendant causes the interception and transmission of the contents of users' electronic communications with the Website to servers controlled by the Third Parties. Defendant's conduct is intentional and coordinated, as the Trackers operate pursuant to Defendant's deliberate configuration and are not necessary to render the Website's core content or functionality.

18. The third-party tracking code executed contemporaneously with each page load and navigation event initiated by Plaintiff's browser. As the browser initiated each HTTP request to retrieve Website content, embedded scripts automatically caused the interception and transmission of the contents of users' communications with the Website to remote third-party endpoints during the page-load process itself, before the requested page finished rendering and without any user interaction or authorization. The Trackers' interception of Plaintiff's communications occurred in transit, at the time Plaintiff selected each particular article or link, and before each page-load process completed.

19. The technical mechanism that causes the Trackers' outbound requests to occur during, and not after, the page-load process is that each Tracker's script or iframe is loaded into Plaintiff's browser asynchronously, either via the async attribute on a static script tag, via dynamic script injection using document.createElement('script'), or via dynamic iframe injection using document.createElement('iframe'). Under HTML Living Standard § 4.12.1 (for script elements) and the Standard's iframe processing model, these elements are fetched and processed in parallel with, and not after, page parsing, and cause outbound network requests to fire during the page-load process. Each of the Trackers deployed on the Website is loaded into Plaintiff's browser asynchronously. During Plaintiff's visit, each Tracker fired its first outbound request to

the respective third party within milliseconds after the browser initiated the main-document request for the URLs identified above, while the main-document response was still in flight and before the page-load process had completed.

20. Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not consent to the contents of their communications with the Website being intercepted by third parties. The Website did not display any consent banner, pop-up, cookie notice, or other authorization mechanism requesting permission before deploying the Trackers to intercept user communications. Defendant did not obtain express prior consent for the interception and transmission of the contents of users' communications for advertising, analytics, or monetization purposes.

21. Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## III. PARTIES

22. Plaintiff GADEER ERAKAT is a California citizen residing in Solano County, CA and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period including but not limited to on March 2, 2026. The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

23. Hilton Domestic Operating Company Inc. is a Delaware corporation that owns, operates, and controls the Website, an online platform through which Hilton offers hospitality services, hotel reservations, destination content, and loyalty program information to consumers nationwide.

24. Hilton is one of the largest hospitality companies in the world, providing hotel accommodations, travel planning services, loyalty program benefits, and destination content to individual and institutional customers. Hilton is organized under the laws of the State of Delaware and maintains its principal executive offices in Massachusetts. Through its Website and related digital platforms, Hilton serves millions

of customers in California and throughout the United States.

25. Hilton conducts business nationwide and engages in product development, marketing, and commercial operations centered on its digital hospitality platform. Hilton's business activities include operating an online platform through which users browse hotel destinations, manage loyalty rewards, access travel content, and utilize web-based reservation and planning tools.

26. The Website, including the mobile site, serves as a core component of Hilton's digital presence. The Website provides users with access to hotel reservations, destination content, loyalty program management, travel offers, and customer-service resources, and functions as the primary consumer-facing platform through which California users access Hilton's hospitality and travel services. The Website is integrated into Hilton's broader digital infrastructure and employs web-based technologies that operate in connection with page loads, navigation, and user interaction.

## IV. JURISDICTION AND VENUE

27. Hilton is subject to personal jurisdiction in this District. On information and belief, Hilton operates hundreds of hotel properties throughout California and maintains more than a dozen regional offices across the state, including in San Francisco, Emeryville, Santa Clara, Los Angeles, San Diego, and Sacramento, that are dedicated to franchise sales, market development, and regional operations.

28. Hilton has cultivated California as among its highest-density domestic markets. The Website serves as a primary digital channel through which Hilton markets and sells hotel accommodations, loyalty programs, and travel services to California consumers. In furtherance of those operations, Hilton entered into and maintained long-term commercial partnerships with California-based data companies, including Treasure Data, Inc., headquartered in Mountain View, California, and Meta Platforms, Inc., headquartered in Menlo Park, California.

29. Through those partnerships, Hilton embedded third-party tracking technologies into the Website that transmit California users' communications to

California-based data infrastructure and servers operated by those California-rooted companies. Plaintiff, a California resident, accessed the Website from California; the tortious interception of her communications occurred on her device in California; and the intercepted data flowed to California-based servers. Plaintiff's claims arise directly from Hilton's purposeful direction of its Website and embedded data-collection systems at California residents and its use of California-based infrastructure to capture and exploit their private communications. Accordingly, the exercise of personal jurisdiction over Hilton in this Court is proper.

30. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because Plaintiff asserts a claim arising under federal law, specifically 18 U.S.C. § 2520, which provides a civil cause of action for violations of 18 U.S.C. § 2511(1)(a) of the Federal Wiretap Act.

31. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the federal claim that they form part of the same case or controversy.

32. This Court also has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class, and the parties are minimally diverse.

33. Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Defendant regularly transacts business in this District, operates the Website that serves millions of California residents, and is subject to personal jurisdiction here; (2) a substantial part of the events or omissions giving rise to the claims occurred within this District, as Plaintiff and other Class Members browsed the Website from within this District; and (3) Defendant derives substantial revenue from California customers in this District.

/ / /

## V. FEDERAL AND STATE PRIVACY LAWS

### 1. *The California Invasion of Privacy Act (CIPA)*

34. The California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

35. Despite predating the Internet, CIPA has been applied to email and other Internet communications so long as that application is consistent with the statutory text and purpose. Section 631(a) reaches the interception of email content and online communications and consent under CIPA must be obtained before the interception occurs.

36. CIPA's text and history confirm that the Legislature intended to protect core privacy rights, as reflected in § 630's declaration that the statute was enacted "to protect the right of privacy of the people of this state." CIPA codifies a substantive right to privacy such that the violations of CIPA alleged herein constitute concrete injuries sufficient to establish Article III standing.

37. Individuals may pursue legal action against violators of Cal. Penal Code § 631 and are entitled to seek $5,000 in statutory penalties per violation. Cal. Penal Code § 637.2(a)(1).

### 2. *The Federal Wiretap Act*

38. The Federal Wiretap Act, enacted as Title III of the Omnibus Crime Control and Safe Streets Act of 1968 and amended by the Electronic Communications Privacy Act (ECPA) of 1986, prohibits the intentional interception of wire, oral, or electronic communications. Congress enacted the statute to safeguard the privacy of

communications against unauthorized interception, recognizing that unchecked surveillance technology poses a fundamental threat to individual liberty.

39. The Federal Wiretap Act applies to communications transmitted over the Internet. The 1986 ECPA amendments expressly extended the statute's protections to electronic communications as defined under 18 U.S.C. § 2510(12) to include "any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce." That includes data transmitted over the internet such as the contents of web browsing activity via HTTP requests as alleged here.

40. In *In re Facebook, Inc. Internet Tracking Litigation,* 956 F.3d 589 (9th Cir. 2020), the Ninth Circuit held that plaintiffs plausibly alleged Facebook was not a "party" to the relevant communications for purposes of the Wiretap Act and Cal. Penal Code § 631(a) party exemption, where Facebook's plug-in code allegedly caused users' browsers, without their knowledge, to duplicate referer-header information from GET requests sent to third-party websites and transmit that information to Facebook through a separate, simultaneous channel. The court concluded that this type of simultaneous, unknown duplication did not entitle Facebook to the party exemption as a matter of law at the pleading stage. In distinguishing cases involving IP addresses and basic site-level URLs, the court further recognized that the alleged full-string URLs and referer headers there could reveal the particular documents viewed, search terms, and other information about users' interests and browsing activity, and therefore were materially different from bare routing information. The court expressly limited its holding to the sufficiency of the allegations and declined to decide the other statutory elements.

41. A person whose electronic communications are intercepted in violation of 18 U.S.C. § 2511 may bring a civil action pursuant to 18 U.S.C. § 2520(a). Available relief includes the greater of actual damages or statutory damages of $100 per day for each day of violation or $10,000, whichever is greater, plus punitive damages in

appropriate cases, reasonable attorney's fees, and other litigation costs reasonably incurred.

## VI. SPECIFIC ALLEGATIONS

42. During her use of the Website, Plaintiff entered the search query 'LGBTQ' into the Website's search function and navigated to pages identifying personal, private, and sexual-orientation-related subject matter, including the specific URLs identified above. Each of Plaintiff's browsing actions, including her search query and her article-URL selections, was itself a substantive communication with the Website, and each disclosed content of the kind protected under Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8).

43. The full URLs Plaintiff transmitted to and that were intercepted from the Website are not bare routing strings. They are full-string URLs that reflect the specific searches Plaintiff conducted and the specific pages Plaintiff viewed. On their face, the URLs disclose the substantive subject matter of Plaintiff's browsing, including her LGBTQ-related search query and her selection of LGBTQ+ Pride-content articles. The page titles and content-category strings transmitted alongside those URLs in the same outbound requests further disclose the substantive content of Plaintiff's browsing. These transmissions were not hashed, encrypted to the recipient, or rendered indecipherable to the Trackers. They were transmitted in plain text.

### *1. The Treasure Data Tracker*

44. Defendant embedded and deployed Treasure Data on the Website, a behavioral analytics and customer data platform operated by Treasure Data, Inc. Treasure Data tracks website visitor behavior, transmits page URLs and user identifiers to Treasure Data's servers in real time, and enables cross-session user profiling and advertising targeting. During Plaintiff's session, Treasure Data received the full URL of pages Plaintiff browsed together with Plaintiff's persistent identifiers in the same outbound requests.

45. Figure 1 shows a Fiddler Classic raw request capture of a POST request to

us01.records.in.treasuredata.com/stage_web_interactions/pageviews. The request headers include Origin: https://stories.hilton.com and Referer: https://stories.hilton.com/, confirming the request originated from the Hilton domain and containing the same complete, human-readable URL the user was viewing, which is one of the URLs Plaintiff viewed. The Fiddler session list reflects multiple Treasure Data requests firing during the page load, establishing that interception occurs simultaneously with the transmission of communications to Hilton's server.

**Figure 1**




46. Likewise, Figure 2 shows a Chrome DevTools Network capture of the POST request payload transmitted to us01.records.in.treasuredata.com. The payload contains the parameter url transmitting the full URL https://stories.hilton.com/destination-spotlight/stay-with-pride-stay-with-hilton-unforgettable-celebrations-await-lgbtq-travelers, together with td_client_id, a persistent Treasure Data client identifier. The page URL and the persistent client identifier appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link.

**Figure 2**




47. Treasure Data's servers at us01.records.in.treasuredata.com returned an HTTP 200 OK response to the POST request in less than 750 milliseconds of Plaintiff's browser initiating the POST request. The response carried an application/vnd.treasuredata.v1.js+json payload dynamically generated by Treasure Data's servers based on the URL contents transmitted in the POST request. In its response, Treasure Data's servers generated and set a per-request _td_global identifier value, a UUID calculated by Treasure Data's servers at the time of the request, with a maximum-age of approximately two years. Together, the sub-second server response, the dynamically-generated response payload, and the per-request server-generated identifier confirm that Treasure Data's servers actively read and processed the intercepted communications in the same page-load window in which Plaintiff's browser was still transmitting the communications to the Website, and did not merely receive bytes for later batch processing.

48. Treasure Data and its operator used the intercepted browsing data, including the URL reflecting Plaintiff's reading of sexual-orientation-related content and her browsing activity, to build behavioral profiles and enable data-driven advertising and

audience segmentation across platforms. This commercial use of intercepted content is precisely what Treasure Data's platform is designed and marketed to accomplish.

49. Taken together, Figures 1 and 2 evidence each element of Treasure Data's unlawful interception. The contents of Plaintiff's electronic communications with the Website, specifically the page URLs identifying what Plaintiff was browsing, were transmitted to Treasure Data's servers in the same HTTP requests that carried persistent identifiers, enabling Treasure Data to link the intercepted content to Plaintiff's browsing profile across sessions. The interception occurred in real time, during transmission.

50. Treasure Data, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring Treasure Data on the Website, and Plaintiff never consented to it.

51. By causing Treasure Data to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

***2. The Koddi Tracker***

52. Defendant embedded Koddi on the Website, a travel-marketing analytics platform operated by Koddi Inc. Koddi collects page identifier data and user tracking information and transmits them to Koddi's servers in real time for targeting and retargeting purposes. During Plaintiff's session, Koddi received a page identifier slug encoding the content path of the page Plaintiff browsed, together with Plaintiff's persistent user identifier, in the same outbound request.

53. Figure 3 shows a Fiddler Classic raw request capture of a GET request to beam.koddi.com/travel with the action=pageView parameter. The request headers include Referer: https://stories.hilton.com/, confirming the request originated from the Hilton domain. The Fiddler session list reflects multiple Koddi requests firing during the page load, establishing that interception occurs simultaneously with the transmission of

communications to Hilton's server.

**Figure 3**




54. Likewise, Figure 4 shows a Chrome DevTools Network capture of the GET request to beam.koddi.com. The query parameters include pageName, a page identifier slug encoding the content path stay-with-pride-stay-with-hilton-unforgettable-celebrations-await-lgbtq-travelers, identifying the LGBTQ content page the user was browsing, together with userGuid, a persistent Koddi user identifier. The page identifier slug and the persistent user identifier appear together in the same outbound request, confirming same-request co-appearance of content identification and a cross-session profile link.

/ / /

/ / /

**Figure 4**




55. Koddi's servers at beam.koddi.com returned an HTTP 200 OK response to each intercepting request in less than 750 milliseconds of Plaintiff's browser initiating the request. In each response, Koddi's servers generated and set a per-request hmGUID identifier value, a UUID calculated by Koddi's servers at the time of the request, with an expiration extending approximately one year in the future. The sub-second server response and the per-request server-generated identifier confirm that Koddi's servers actively read and processed the intercepted communications in the same page-load window in which Plaintiff's browser was still transmitting the communications to the Website, and did not merely receive bytes for later batch processing.

56. Koddi and its operator used the intercepted browsing data, including the page identifier encoding Plaintiff's browsing content, to build behavioral profiles and enable travel-industry retargeting and audience segmentation across advertising platforms.

57. Taken together, Figures 3 and 4 evidence each element of Koddi's unlawful interception. The contents of Plaintiff's electronic communications with the Website, including the page identifier encoding what Plaintiff was browsing, were transmitted to

Koddi's servers in the same HTTP requests that carried Plaintiff's persistent user identifier, enabling Koddi to link the intercepted content to Plaintiff's browsing profile across sessions. The interception occurred in real time, during transmission.

58. Koddi Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring Koddi on the Website, and Plaintiff never consented to it.

59. By causing Koddi to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

***3. The Facebook Pixel Tracker***

60. Defendant embedded the Facebook Pixel on the Website, a tracking technology operated by Meta Platforms, Inc. The Facebook Pixel collects page URL data and persistent user identifiers and transmits them to Meta's servers in real time for advertising targeting and measurement. During Plaintiff's session, the Facebook Pixel received the full URL of pages Plaintiff browsed together with Plaintiff's persistent browser-based advertising identifier in the same outbound request.

61. Figure 5 shows a Fiddler Classic raw request capture of a GET request to www.facebook.com/tr. The request headers include Origin: https://stories.hilton.com and Referer: https://stories.hilton.com/, confirming the request originated from the Hilton domain and containing the same complete, human-readable URL the user was viewing. The Fiddler session list reflects multiple Facebook Pixel requests firing during the page load, establishing that interception occurs simultaneously with the transmission of communications to Hilton's server.

/ / /

/ / /

**Figure 5**




62. Likewise, Figure 6 shows a Chrome DevTools Network capture of the GET request to www.facebook.com/tr. The query parameters include dl transmitting the full URL https://stories.hilton.com/destination-spotlight/stay-with-pride-stay-with-hilton-unforgettable-celebrations-await-lgbtq-travelers, together with fbp, a persistent Facebook browser-based advertising identifier. The page URL and the persistent advertising identifier appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

/ / /

**Figure 6**




63. Meta's servers at www.facebook.com returned an HTTP 200 OK response to each intercepting request in less than 750 milliseconds of Plaintiff's browser initiating the request. The Facebook Pixel is designed such that Meta's servers process the transmitted URL and event data in real time and return a response in the same HTTP transaction. Meta's contemporaneous return response confirms that Meta's servers actively read and processed the intercepted communications in the same page-load window in which Plaintiff's browser was still transmitting the communications to the Website, and did not merely receive bytes for later batch processing.

64. On information and belief, the fbp identifier is derived from the _fbp first-party cookie stored on the .hilton.com domain, making it a cross-session persistent identifier that links the user's browsing activity to the same Meta advertising profile. Plaintiff and the Class Members did not consent to the transmission of the contents of their browsing activity to Meta or to the cross-session linking of their page visits to their Meta advertising profiles.

65. Meta and its Facebook advertising platform used the intercepted browsing data, including the URL reflecting Plaintiff's reading of sexual-orientation-related

content and her browsing activity, to build behavioral profiles and participate in real-time bidding auctions, enabling advertisers to target users based on the specific content they browsed.

66. Taken together, Figures 5 and 6 evidence each element of the Facebook Pixel's unlawful interception. The contents of Plaintiff's electronic communications with the Website, specifically the page URLs identifying what Plaintiff was browsing, were transmitted to Meta's servers in the same HTTP requests that carried persistent advertising identifiers, enabling Meta to link the intercepted content to Plaintiff's browsing profile across sessions. The interception occurred in real time, during transmission.

67. Meta Platforms, Inc. is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the Facebook Pixel on the Website, and Plaintiff never consented to it.

68. By causing Meta Platforms, Inc. to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

### *4. The Bing Universal Event Tracking Pixel*

69. Defendant embedded the Microsoft Advertising Universal Event Tracking (UET) pixel on the Website, a tracking technology operated by Microsoft Corporation. The Bing UET pixel collects page URL data and persistent visitor identifiers and transmits them to Microsoft's servers in real time for advertising targeting and conversion measurement. During Plaintiff's session, the Bing UET pixel received the full URL of pages Plaintiff browsed together with Plaintiff's persistent visitor identifier in the same outbound request.

70. Figure 7 shows a Fiddler Classic raw request capture of a GET request to bat.bing.com. The Fiddler session list reflects multiple Bing UET requests firing during

the page load, establishing that interception occurs simultaneously with the transmission of communications to Hilton's server.

**Figure 7**




71. Likewise, Figure 8 shows a Chrome DevTools Network capture of the GET request to bat.bing.com. The query parameters include p transmitting the full URL https://stories.hilton.com/destination-spotlight/stay-with-pride-stay-with-hilton-unforgettable-celebrations-await-lgbtq-travelers, together with vid=226c3f20115711f1bc673758ad888f66, a persistent Microsoft visitor identifier. The page URL and the persistent visitor identifier appear together in the same outbound request, confirming same-request co-appearance of page content and a cross-session profile link.

/ / /

/ / /

**Figure 8**




72. Microsoft's servers at bat.bing.com returned an HTTP 204 response to each intercepting request in less than 750 milliseconds of Plaintiff's browser initiating the request. In each response, Microsoft's servers generated and set a per-request MUID identifier value, a 32-character hexadecimal identifier calculated by Microsoft's servers at the time of the request. The sub-second server response and the per-request server-generated identifier confirm that Microsoft's servers actively read and processed the intercepted communications in the same page-load window in which Plaintiff's browser was still transmitting the communications to the Website, and did not merely receive bytes for later batch processing.

73. Microsoft's Bing UET system transmitted a persistent visitor identifier (the vid parameter) as a URL query parameter embedded in each request sent to bat.bing.com, enabling Microsoft to link and persistently identify Plaintiff's browsing activity across the Website to a unique Microsoft advertising profile. Plaintiff and the Class Members did not consent to the transmission of the contents of their browsing activity to Microsoft or to the profiling of their page visits by Microsoft's advertising systems.

74. Microsoft and its Bing Ads platform used the intercepted browsing data, including the URL identifying Plaintiff's browsing activity, to build behavioral profiles and enable advertising targeting through the Microsoft advertising network.

75. Taken together, Figures 7 and 8 evidence each element of the Bing UET pixel's unlawful interception. The contents of Plaintiff's electronic communications with the Website, specifically the page URLs identifying what Plaintiff was browsing, were transmitted to Microsoft's servers in the same HTTP requests that carried persistent visitor identifiers, enabling Microsoft to link the intercepted content to Plaintiff's browsing profile across sessions. The interception occurred in real time, during transmission.

76. Microsoft Corporation is not a party to the communications between Plaintiff and the Website; it is a third-party interceptor that surreptitiously duplicated and captured those communications as they occurred. Defendant caused this interception by deliberately embedding and configuring the Bing UET pixel on the Website, and Plaintiff never consented to it.

77. By causing Microsoft Corporation to intercept the contents of Plaintiff's electronic communications with the Website in this manner, Defendant violated Cal. Penal Code § 631 and 18 U.S.C. § 2511(1)(a).

78. The return-response artifacts described in the preceding tracker-specific allegations, including per-request Set-Cookie identifier values that each Tracker's server generated at the moment of transmission, each Tracker's server response wait times of less than 750 milliseconds, and dynamically-generated response payloads whose contents varied based on the specific URL transmitted, confirm that each Tracker read and processed the intercepted contents of Plaintiff's communications in real time. The Trackers acquired those contents by means of a contemporaneous duplicate transmission during the page-load process, and the contents were then read and processed by the Trackers' servers within milliseconds, in the same page-load window in which Plaintiff's browser was still transmitting the communications to the Website.

79. Each Tracker's operator is a third-party eavesdropper on the two-party communications channel between Plaintiff's (and Class Members') browsers and the Website. The Trackers did not receive separate communications addressed to them by Plaintiff or Class Members. Each Tracker's operator itself intercepted the contents of Plaintiff's and Class Members' electronic communications with the Website, in transit, in real time, while those communications were still being transmitted to the Website's servers, in violation of the second clause of Cal. Penal Code § 631(a). Each Tracker's operator additionally used the contents so obtained, in violation of the third clause of Cal. Penal Code § 631(a). Those interceptions and uses by the Trackers are the underlying unlawful acts that Defendant aided, agreed with, employed, and conspired to accomplish, in violation of the fourth clause of Cal. Penal Code § 631(a).

80. Defendant aided, agreed with, employed, and conspired with Treasure Data, Inc., Koddi Inc., Meta Platforms, Inc., and Microsoft Corporation to intercept the contents of Plaintiff's and the Class Members' electronic communications with the Website. Defendant aided the interception by selecting, embedding, and configuring the Treasure Data, Koddi, Facebook Pixel, and Bing UET tracking technologies within the Website's source code so that those technologies would intercept users' communications during the page-load process. Defendant agreed with each Tracker's operator to that interception by entering into and maintaining the commercial vendor and publisher relationships that govern the operation of those technologies on the Website. Defendant employed each Tracker's operator to perform that interception as part of Defendant's monetization of the Website. And Defendant conspired with each Tracker's operator by acting in coordination with them, through the deliberate configuration and operation of the Trackers, to capture and exploit the contents of Plaintiff's and the Class Members' communications without their knowledge or consent.

## VII. CLASS ALLEGATIONS

81. Plaintiff brings this action individually and on behalf of all others similarly situated defined as follows. Plaintiff is a member of the Class and of the Subclass:

**<u>Class</u>**: All persons within California whose electronic communications with the Website, including the URL contents of their HTTP requests to the Website were intercepted by one or more Trackers between March 2, 2025 and the present.

**<u>Subclass</u>**: All members of the Class whose intercepted communications included (a) the URL or search parameter of a search conducted through the Website's search function containing the term "LGBTQ," or (b) the full-string URL of one or more of the Website's destination-spotlight or "Stay With Pride" articles addressing LGBTQ+ travel or Pride content, including the two destination-spotlight articles Plaintiff viewed as alleged above.

82. NUMEROSITY: Plaintiff does not know the number of Class and Subclass Members but believes the number to be in the thousands, if not more. The exact identities of Class and Subclass Members can be ascertained by the records maintained by Defendant.

83. COMMONALITY: Common questions of fact and law exist as to all Class Members and Subclass Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions include but are not limited to:

- Whether Defendant configured the Website to transmit the URL contents of visitors' HTTP requests to the Trackers;
- Whether the URL contents of those requests constitute "contents" of electronic communications within the meaning of Cal. Penal Code § 631(a) and 18 U.S.C. § 2510(8);
- Whether Defendant's conduct constitutes interception of electronic communications in violation of Cal. Penal Code § 631(a);
- Whether Defendant's conduct constitutes intentional interception of electronic communications in violation of 18 U.S.C. § 2511(1)(a);

- Whether Defendant's conduct constitutes an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to restitution.

84. TYPICALITY: As a person who visited the Website and whose URL contents were intercepted by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members and Subclass Members.

85. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class and Subclass. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or Subclass or whose inclusion would otherwise be improper are excluded.

86. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members and Subclass Members is impracticable and inefficient. Even if every Class and Subclass Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VIII. FIRST CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

***By Plaintiff and the Class Members and, in the Alternative, the Subclass Members, Against All Defendants***

87. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

88. Plaintiff brings this cause of action on behalf of herself and the Class.

89. California Penal Code § 631(a) prohibits any person from willfully and without the consent of all parties to the communication reading, or attempting to read, or learning the contents or meaning of any message, report, or communication while the same is in transit, and from using or attempting to use, in any manner or for any purpose, any information so obtained.

90. The full URLs of Plaintiff's and Class members' HTTP requests to the Website constitute the "contents" of those communications within the meaning of § 631(a). As described in the preceding tracker-specific allegations, the Trackers received human readable copies of URL strings in the same HTTP request or response in which the Website servers received it, while that communication was in transit between Plaintiff's browser and the Website.

91. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to the Trackers and permitted the Trackers to use that information for user profiling and targeted advertising. The Trackers are third parties to the communications between Plaintiff and the Website. In the alternative, and to the extent Defendant is itself deemed a party to the communications at issue, Defendant aided, agreed with, employed, and conspired with the Trackers to read, attempt to read, and learn the contents of Plaintiff's and Class members' electronic communications with the Website while those communications were in transit, in real time, and to use the information so obtained, within the meaning of Cal. Penal Code § 631(a). Plaintiff and Class members did not consent to interception of the contents of their communications by any Tracker, and no exception to § 631(a) applies.

92. Each interception constitutes a separate violation of § 631(a). Plaintiff and the Class are entitled to recover the greater of actual damages or $5,000 per violation pursuant to Cal. Penal Code § 637.2(a)(1), injunctive relief, and such other relief as the Court deems just and proper.

93. By intentionally aiding, agreeing with, employing, and conspiring with Treasure Data, Inc., Koddi Inc., Meta Platforms, Inc., and Microsoft Corporation to

intercept the contents of Plaintiff's and the Class Members' electronic communications with the Website, as alleged above, Defendant violated the fourth clause of California Penal Code section 631(a).

## IX. SECOND CAUSE OF ACTION

### Violations of 18 U.S.C. § 2511(1)(a)

***By Plaintiff and the Class Members and, in the Alternative, the Subclass Members, Against All Defendants***

94. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

95. Plaintiff brings this cause of action on behalf of herself and the Class.

96. 18 U.S.C. § 2511(1)(a) prohibits any person from intentionally intercepting any wire, oral, or electronic communication. The Federal Wiretap Act defines "contents" to include any information concerning the substance, purport, or meaning of a communication. 18 U.S.C. § 2510(8).

97. The full URLs of Plaintiff's and Class members' HTTP requests to the Website are "contents" of electronic communications within the meaning of 18 U.S.C. § 2510(8). Those URLs communicate the substance and meaning of Plaintiff's and Class members' browsing. As described in the preceding tracker-specific allegations, the Trackers intercepted URL contents in real time, in the same HTTP request or response in which the Website's servers received them, while those communications were in transit. As described in the preceding tracker-specific allegations, each Tracker read and processed the contents of Plaintiff's communications in real time, in the same page-load window in which Plaintiff's browser was still transmitting the communications to the Website.

98. Defendant intentionally configured the Website to transmit Plaintiff's and Class members' URL contents to each Tracker, and itself received and used those URL contents for audience segmentation and ad targeting. The Trackers are third parties to the communications between Plaintiff and the Website. In the alternative, and to the

extent Defendant is itself deemed a party to the communications at issue, Defendant intercepted the contents of those communications through the Trackers it selected, embedded, and configured on the Website, and Defendant's interception was undertaken for the tortious purposes alleged below, such that the exemption of 18 U.S.C. § 2511(2)(d) does not apply Plaintiff and Class members did not consent to this interception, and no exception applies.

99. Defendant's purpose in causing the interception was tortious and independent of the interception itself. Defendant caused the interception in order to obtain and commercially exploit the substantive contents of users' communications with the Website for behavioral profiling, cross-session audience modeling, and targeted advertising monetization, purposes that constitute unlawful invasion of privacy under Article I, Section 1 of the California Constitution and under the common-law tort of intrusion upon seclusion. Those purposes are independent of, and additional to, the act of interception itself, and satisfy 18 U.S.C. § 2511(2)(d)'s crime-or-tort proviso.

100. Plaintiff and the Class are entitled to relief under 18 U.S.C. § 2520, including the greater of actual damages plus any profits made by Defendant through the interception, or statutory damages of $100 per day per violation or $10,000, whichever is greater, together with punitive damages, reasonable attorney's fees, and litigation costs.

## X. THIRD CAUSE OF ACTION

**Violations of Business & Professions Code § 17200**

***By Plaintiff and the Class Members and, in the Alternative, the Subclass Members, Against All Defendants***

101. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

102. Plaintiff brings this cause of action on behalf of herself and the Class.

103. California Business and Professions Code § 17200 prohibits any unlawful, unfair, or fraudulent business act or practice. Defendant's conduct constitutes both an

unlawful and an unfair business practice.

104. Defendant's conduct is unlawful. By facilitating the interception of the contents of Plaintiff's and Class members' electronic communications without consent, Defendant violated California Penal Code § 631(a) and 18 U.S.C. § 2511(1)(a). Each statutory violation constitutes a predicate unlawful business act or practice under § 17200.

105. Defendant's conduct is also unfair. Defendant covertly transmitted Plaintiff's and Class members' visitors' URL contents to third-party Trackers for commercial monetization without disclosure, authorization, or compensation. The harm to Plaintiff and the Class including but not limited to the interception and commercial exploitation of sensitive personal information and the financial value thereof is substantial, is not outweighed by any legitimate countervailing benefit, and could not reasonably have been avoided by Plaintiff or Class members. Defendant's conduct constitutes an unfair business practice under Cal. Bus. & Prof. Code § 17200 because it violates the public policy embodied in, and tethers to, the California Invasion of Privacy Act, Cal. Penal Code § 631(a), and Article I, Section 1 of the California Constitution, statutes and constitutional provisions that establish substantive privacy protections for California residents.

106. Plaintiff and Class members suffered injury in fact and lost money or property as a result of Defendant's conduct. Browsing data identifying the specific content Plaintiff and Class members view, including the search queries Plaintiff entered and the browsing URLs of the kind intercepted here, has recognized and quantifiable economic value in the digital advertising marketplace. Defendant's unauthorized collection and disclosure of that data deprived Plaintiff and Class members of control over their data and of their ability to participate in the market for such data. In addition, and independently, Defendant and the Trackers commodified and monetized Plaintiff's and Class members' browsing data through targeted advertising, audience segmentation, and real-time bidding, generating profits at Plaintiff's and Class members' expense.

107. Plaintiff and Class members provided their browsing data as implicit consideration for access to the Website, a data-for-services exchange that was not disclosed and to which they did not consent. Defendant and the Trackers are designed to and on information and belief did capture the economic benefit of that exchange, in the form of advertising revenue and RTB clearing prices generated by the Trackers' use of users' intercepted URL data, without compensating Plaintiff or Class members. Plaintiff and Class members were thereby deprived of the economic value of their data and of the full value of a privacy-protective browsing experience they reasonably expected and would have bargained for had the exchange been disclosed.

108. Plaintiff pleads Plaintiff's UCL claim, and Plaintiff's request for equitable relief thereunder, in the alternative to Plaintiff's claims for legal remedies. Plaintiff has no adequate remedy at law for the ongoing and prospective harms flowing from Defendant's continuing conduct, including the ongoing use of Plaintiff's intercepted browsing data by Defendant and by the third-party Trackers for behavioral profiling, audience segmentation, targeted advertising, and real-time bidding. Statutory damages for past interceptions do not remedy that ongoing use and do not restore Plaintiff to the position she would have occupied absent Defendant's conduct.

## XI. FOURTH CAUSE OF ACTION

### Violation of the California Constitution, Article I, Section 1

***By Plaintiff and the Class Members and, in the Alternative, the Subclass Members, Against All Defendants***

109. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

110. Plaintiff brings this cause of action on behalf of herself and the Class.

111. Article I, Section 1 of the California Constitution provides that privacy is among the inalienable rights of all people in California. To state a claim for violation of the constitutional right to privacy, a plaintiff must establish: (1) a legally protected privacy interest; (2) a reasonable expectation of privacy in the circumstances; and (3)

conduct by the defendant constituting a serious invasion of privacy.

112. Plaintiff and Class Members have a legally protected privacy interest in the contents of their electronic communications with the Website, including the specific page URLs reflecting their browsing activity. California law recognizes a legally protected privacy interest in personal browsing activity, particularly when that activity is covertly intercepted by commercial third parties for advertising and profiling purposes without disclosure or consent.

113. Plaintiff and Class Members had a reasonable expectation of privacy in the contents of their electronic communications with the Website. The Website is a publisher-and-index platform on which Defendant itself authors, publishes, and markets content addressing sensitive subject matter, including LGBTQ+ Pride content marketed by Defendant under 'Stay With Pride' branding and destination-spotlight campaigns addressing LGBTQ+ travel, and on which Defendant invites users to search that content by subject matter through the Website's search function. A reasonable person reading Defendant's own LGBTQ+ Pride content on Defendant's own website, having navigated to that content through Defendant's own search function, does not expect that the reading of that content will be transmitted in real time to four separate third-party commercial ad platforms and used for cross-session audience profiling, real-time bidding, and targeted advertising. That expectation is reinforced by the absence of any consent banner, cookie notice, or other disclosure of the Trackers' operation on the Website at the time of Plaintiff's visit, and by Defendant's public representations regarding privacy on the Website.

114. Defendant's conduct constitutes a serious invasion of that privacy. By deliberately embedding and configuring four third-party tracking technologies on the Website, Defendant caused the real-time, covert interception of the URL contents of Plaintiff's and Class Members' electronic communications and their transmission to Treasure Data, Inc., Koddi Inc., Meta Platforms, Inc., and Microsoft Corporation, where they were linked to persistent cross-session profiles and used for commercial advertising

and analytics purposes without Plaintiff's knowledge or consent. The severity of the invasion is heightened by the nature of the Website and the sensitivity of the content browsed, the persistent and cross-platform nature of the identifiers used, and the commercial exploitation of the intercepted data.

115. As a result of Defendant's invasion of their privacy, Plaintiff and Class Members have suffered harm, including loss of privacy, loss of control over their personal information, and the unauthorized commercial exploitation of their browsing activity. Plaintiff and the Class seek injunctive relief, nominal damages, and all other relief authorized by law.

116. Plaintiff pleads Plaintiff's California Constitution invasion of privacy claim, and Plaintiff's request for injunctive relief and nominal damages thereunder, in the alternative to Plaintiff's claims for legal remedies. Plaintiff has no adequate remedy at law for the ongoing and prospective privacy invasions flowing from Defendant's continuing tracker deployment.

## XII. FIFTH CAUSE OF ACTION

### Intrusion Upon Seclusion

***By Plaintiff and the Class Members and, in the Alternative, the Subclass Members, Against All Defendants***

117. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

118. Plaintiff brings this cause of action on behalf of herself and the Class.

119. The common law tort of intrusion upon seclusion requires: (1) an intentional intrusion, physically or otherwise, into a place, conversation, or matter in which the plaintiff has a reasonable expectation of privacy; and (2) that the intrusion would be highly offensive to a reasonable person.

120. Defendant intentionally intruded into Plaintiff's and Class Members' electronic communications with the Website by deliberately selecting, embedding, and configuring four third-party tracking technologies, namely Treasure Data, Koddi, the

Facebook Pixel, and the Bing UET Pixel, that intercepted the URL contents of those communications in real time and transmitted them to Treasure Data, Inc., Koddi Inc., Meta Platforms, Inc., and Microsoft Corporation without Plaintiff's knowledge or consent. Defendant's intrusion was intentional because Defendant deliberately embedded and configured each Tracker for the specific commercial purpose of identity resolution, cross-session behavioral profiling, audience segmentation, and monetization of user browsing activity through targeted advertising and real-time bidding, precisely the purposes for which each Tracker is designed and marketed by its operator.

121. Defendant knew that the Website hosts an editorial index of subject-matter content authored and published by Defendant, including LGBTQ+ Pride content specifically marketed by Defendant under "Stay With Pride" branding and destination-spotlight content addressing LGBTQ+ travel, and that the Website's search function permits users to search that content by subject matter. Defendant intentionally configured the Trackers to intercept the URLs, page titles, and content categories of the specific Website pages users browsed and the specific search queries users entered, and Defendant knew that the intercepted contents would necessarily include the substantive subject matter of users' browsing, including but not limited to users' browsing of LGBTQ+ Pride content published by Defendant. Defendant intended the Trackers to capture the substance of the communications between users and the Website, and intended that substance to include the sensitive subject matters Defendant itself publishes and indexes on the Website. Defendant's intrusion was therefore not accidental or incidental to non-invasive analytics; Defendant purposefully configured the Trackers to acquire the substantive contents of users' communications for behavioral profiling and commercial monetization by Defendant and the Third Parties.

122. Defendant's conduct was highly offensive to a reasonable person. The surreptitious, real-time transmission to four separate third-party commercial ad platforms of URLs, page titles, and content categories reflecting users' engagement with sexual-orientation-related content published by Defendant on the Website, without

notice or consent, contravenes accepted norms of confidentiality that attach to the reading of sensitive-content material. A reasonable person does not expect a website operator to transmit her reading of such content, in the same page-load window in which she is reading it, to commercial ad platforms that will use that transmission to categorize her in cross-session audience profiles and to serve targeted advertising, regardless of the reader's own sexual orientation. The invasion carries known outing and misattribution risks because third-party ad platforms and downstream data buyers may treat the reader as inferentially associated with the community whose content is being read, based on the intercepted data, whether or not the reader is in fact a member of that community. The severity of the intrusion is further increased by the persistence of the identifier values with which the intercepted content is transmitted, which extend approximately one to two years and permit the intercepted browsing to be linked to the same user across sessions and across other websites.

123. As a result of Defendant's intrusion upon their seclusion, Plaintiff and Class Members have suffered harm, including loss of privacy, emotional distress, and the unauthorized exploitation of their personal information. Plaintiff and the Class seek compensatory damages, nominal damages, injunctive relief, and all other appropriate relief.

## XIII. SIXTH CAUSE OF ACTION

### Unjust Enrichment

***By Plaintiff and the Class Members and, in the Alternative, the Subclass Members, Against All Defendants***

124. Plaintiff re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

125. Plaintiff brings this cause of action on behalf of herself and the Class.

126. Plaintiff pleads Plaintiff's unjust enrichment claim as a quasi-contract claim for restitution in the alternative to Plaintiff's other claims. Unjust enrichment requires: (1) a benefit conferred on the defendant; (2) at the expense of the plaintiff; and (3)

circumstances that make it inequitable for the defendant to retain the benefit without compensating the plaintiff.

127. Defendant received a benefit by permitting Treasure Data, Inc., Koddi Inc., Meta Platforms, Inc., and Microsoft Corporation to deploy their tracking technologies on the Website. In exchange for allowing these third parties to intercept and collect the URL contents of visitors' communications with the Website, Defendant received monetary compensation, data licensing benefits, promotional support, or other commercial value. Defendant's arrangement with these tracking operators enabled it to offer analytics, retargeting, and advertising services that generated commercial revenue and business value.

128. Defendant received this benefit at Plaintiff's and Class Members' expense. Plaintiff's and Class Members' browsing data constitutes personal property with recognized economic value in the digital advertising marketplace. By intercepting the URL contents of Plaintiff's communications and transmitting them to third-party trackers, Defendant and its tracking partners extracted the commercial value of that data without compensation. Plaintiff and Class Members also suffered the loss of control over their personal information, which has recognized economic value as a privacy-protective property interest.

129. It is inequitable for Defendant to retain the benefits of its data-for-services arrangement without compensating Plaintiff and Class Members whose browsing activity was the source of that commercial value. Defendant's concealment of the tracking arrangement and its failure to obtain Plaintiff's and Class Members' informed consent render retention of those benefits unjust. California law recognizes a right to disgorgement of profits resulting from unjust enrichment, even where an individual has not suffered a corresponding loss.

130. Plaintiff and the Class seek restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class Members' expense.

131. Plaintiff pleads Plaintiff's unjust enrichment claim, and Plaintiff's request for restitution and disgorgement thereunder, in the alternative to Plaintiff's claims for legal remedies. Plaintiff has no adequate remedy at law for the ongoing profits Defendant continues to derive from its data-for-services arrangement with the third-party Trackers.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class and the Subclass, naming Plaintiff as Class and Subclass representative, and naming Plaintiff's attorneys as Class counsel;
2. An order declaring that Defendant's conduct violates Cal. Penal Code § 631(a), 18 U.S.C. § 2511(1)(a), Cal. Bus. & Prof. Code § 17200, et seq., Article I, Section 1 of the California Constitution, and the common law prohibition against intrusion upon seclusion;
3. An order enjoining Defendant from continuing the conduct alleged herein;
4. Statutory damages pursuant to Cal. Penal Code § 637.2(a)(1) of $5,000 per violation;
5. Statutory damages pursuant to 18 U.S.C. § 2520 of the greater of actual damages plus any profits made by Defendant through the violation, or $100 per day per violation or $10,000, whichever is greater;
6. Punitive damages pursuant to 18 U.S.C. § 2520;
7. Restitution pursuant to Cal. Bus. & Prof. Code § 17200, et seq.;
8. Nominal damages and injunctive relief for violation of Article I, Section 1 of the California Constitution;
9. Compensatory and nominal damages for intrusion upon seclusion;
10. Restitution and disgorgement of all amounts by which Defendant was unjustly enriched at Plaintiff's and Class and Subclass Members' expense;
11. Prejudgment interest;
12. Reasonable attorney's fees and costs; and
13. Such other and further relief as the Court deems just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated: July 22, 2026

**LAW OFFICES OF ROSS CORNELL, APC**

By: */s/ Ross C. Cornell*
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

**NATHAN & ASSOCIATES, APC**
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

*Attorneys for Plaintiff and the Putative Class*